UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X
:
*In re: Application of Passport Special Opportunities* :
*Master Fund, LP for an Order Compelling Compliance* :
*with a Subpoena Issued to Deloitte Touche Tohmatsu* :
*Limited Pursuant to 28 U.S.C. § 1782* :
:
--------------------------------------------------------------------- X

16 Misc. 33 (PAE)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/1/16

PAUL A. ENGELMAYER, District Judge:

Before the Court, sitting in Part I, is a motion by Passport Special Opportunities Master

Fund, LP ("Passport") to compel Deloitte Touche Tohmatsu Limited ("DTTL") to comply with a

subpoena issued pursuant to 28 U.S.C. § 1782. The subpoena seeks production of a letter (the

"Letter"). The letter, which Passport has learned of but does not possess, purports to have been

written by Passport to ARY Communications, Inc. ("ARY"). It was thereafter transmitted to

Deloitte Yousef Adil ("Deloitte Pakistan"), ARY's former auditor. Passport seeks to gain access

to the Letter, which Passport claims is fraudulent, so as to use it in proceedings in Pakistan and

Dubai against ARY and its affiliates.

DTTL opposes the motion on three grounds: that (1) Passport has not satisfied the

requirements for discovery under Federal Rule of Civil Procedure 45 because it has not shown

that DTTL has possession, custody, or control over the Letter; (2) Passport has not satisfied the

statutory requirements for discovery under 28 U.S.C. § 1782; and (3) the discretionary factors

relevant to a § 1782 inquiry weigh against production of the Letter.

For the reasons that follow, the Court denies Passport's motion based on the first ground:

that Passport has not met its burden of showing that DTTL has possession, custody, or control

over the Letter.

## I.     Background[1]

Passport, a British Virgin Islands limited partnership, is a pooled investment vehicle.  Pet. ¶ 2.  ARY is a Pakistani private limited company.  *Id.* ¶ 5.

On June 15, 2008, Passport entered into an investment funding agreement with ARY (the "Agreement"), under which Passport provided ARY with $5 million as working capital in advance of ARY's planned IPO.  *Id.* ¶ 14.  Under the Agreement, Passport retained an option to demand repayment plus accrued profit/markup if the IPO did not timely proceed.  *Id.*

Thereafter, ARY failed to undertake an IPO and defaulted on its repayment obligation. *Id.*  In response, on September 10, 2009, Passport initiated an International Chamber of Commerce ("ICC") arbitration against ARY in Singapore.  *Id.* ¶¶ 15–16.  ARY, in turn, obtained an *ex parte* injunction from the High Court of Sindh, Karachi, Pakistan, enjoining the arbitration. *Id.* ¶ 16.  The arbitration nonetheless proceeded, and on February 20, 2012, the arbitral panel issued an award in favor of Passport.  *Id.*

Passport alleges that, to date, ARY has not satisfied the arbitral award or its contractual debt to Passport.  *Id.* ¶ 17.  Passport further alleges that, in an effort to conceal this debt, ARY submitted to Deloitte Pakistan, its auditor at the time, a forged letter (the "Letter") on Passport letterhead purporting to verify that Passport's investment was an "advance against share capital." *Id.* ¶¶ 18–19.  On the basis of the Letter, Passport alleges, ARY's FYE June 30, 2012 financial statement fraudulently mischaracterized Passport's investment.  *Id.*

---

[1] The Court's account of the facts are drawn from Passport's *ex parte* petition for a subpoena pursuant to 28 U.S.C. § 1782, Dkt. 3, Ex. A ("Pet."), as well as the declarations submitted by Passport, Dkt. 3 ("Blue Decl."), and DTTL, Dkt. 9 ("Farrell Decl."); Dkt. 10 ("Pecoraro Decl."), in connection with this motion, and their accompanying exhibits.  The Court also references factual representations made by counsel at argument on February 23, 2016.  Citations to "Tr." refer to the transcript of that proceeding.

In January 2014, Passport opened an enquiry with the Securities and Exchange Commission of Pakistan (the "SECP"), asking it to investigate ARY's purportedly materially misleading FYE June 30, 2012 financial statement.  *Id.* ¶ 21.  ARY, in turn, obtained an order from a Karachi court temporarily enjoining the SECP proceeding, on the ground that the SECP is biased against ARY.  *Id.* ¶ 22.

On June 17, 2015, Passport filed in this District an application for *ex parte* assistance in aid of a foreign proceeding pursuant to 28 U.S.C. § 1782, seeking leave to serve a subpoena for the Letter on DTTL (a United Kingdom private company) and Deloitte LLP (a Delaware limited liability partnership).  *See generally* Pet.; *id.* ¶¶ 3–4.  In it, Passport represented that it intends to use the Letter to cause the Karachi court's injunction to be set aside so that the SECP enquiry may proceed.  *Id.* ¶ 22.  Passport stated that it also intends to use the Letter in a civil suit in Dubai against ARY's parent company, ARY Digital FZ LLC, and ARY's CEO, who is personally liable for the debt owed by ARY to Passport.  *Id.* ¶ 23.

On June 18, 2015, the Honorable Paul A. Crotty, sitting in Part I, granted Passport's application, without prejudice to the rights of DTTL and Deloitte LLP to later challenge the subpoena.  Blue Decl., Ex. E.

On June 22, 2015, Passport delivered two copies of the subpoena, addressed to Deloitte LLP and DTTL, respectively, to Deloitte LLP.  Pecoraro Decl. ¶¶ 4–5.

As to Deloitte LLP, it filed, through counsel, objections to the subpoena and informed Passport's counsel that the subpoena was defective because it did not describe the documents sought.  *Id.* ¶ 4.  Deloitte LLP also notified Passport that the subpoena to DTTL (which was similarly defective) had not been received by a person authorized to accept service for DTTL.  *Id.* ¶¶ 5–6.  Deloitte LLP later represented to Passport that it did not possess the Letter or a copy

of it.  *See* Tr. 3–5.  Passport thereafter made no further efforts to enforce the subpoena or to otherwise obtain the Letter from Deloitte LLP.  Tr. 5.

As to DTTL, on November 5, 2015, Passport served the subpoena on DTTL through outside counsel.  Pecoraro Decl. ¶ 2.  On November 18, 2015, DTTL served its objections to the subpoena.  *Id.* ¶ 3; Blue Decl., Ex. L.  DTTL objected primarily on the grounds that, like Deloitte LLP, it did not have the Letter in its possession, custody, or control.  *Id.*

That day, Passport sent a letter to Deloitte Pakistan, requesting that it produce a copy of the Letter.  *See* Blue Decl., Ex. K.  Deloitte Pakistan responded with a letter informing Passport that Deloitte Pakistan is prohibited under Pakistani law from disclosing, without ARY's consent, any information acquired in the course of its professional engagement with ARY.  *See id.*, Ex. M.  Deloitte Pakistan stated, however, that it would seek authorization from ARY to release the Letter.  *Id.*  On December 22, 2015, DTTL provided Passport with a copy of a letter from ARY to Deloitte Pakistan, dated December 12, 2015, in which ARY refused to give such authorization.  *See id.*, Ex. N.  Apart from this informal request, Passport has not directly sought to compel production of the Letter by either ARY or Deloitte Pakistan.  Tr. 8–9.[2]

On January 26, 2016, Passport moved in this Court to compel DTTL's compliance with the subpoena, Dkt. 1, and filed a memorandum of law, Dkt. 2. ("Passport Br."), and a declaration by its counsel, Blue Decl., in support.  On February 9, 2016, DTTL filed an opposition to Passport's motion, Dkt. 8 ("DTTL Br."), and declarations by its outside counsel, Farrell Decl., and assistant general counsel, Pecoraro Decl.  On February 16, 2016, Passport replied.  Dkt. 12 ("Passport Reply Br.").  On February 23, 2016, the Court, sitting in Part I, heard argument.

---

[2] At argument, Passport's counsel represented that Passport has not used formal legal or political channels in Pakistan to obtain the Letter from Deloitte Pakistan, for example, by filing an application with the Pakistani courts or government.  Tr. 9.

**II.      Applicable Legal Standards**

**A.       28 U.S.C. § 1782**

Section 1782 authorizes district courts to order discovery from third parties in the United

States for use in foreign proceedings.  *See* 28 U.S.C. § 1782.  Such discovery shall be produced

"in accordance with the Federal Rules of Civil Procedure."  *Id.* § 1782(a).  "Pursuant to § 1782, a

district court is authorized to assist a foreign or international tribunal or a litigant before such a

tribunal by ordering discovery where (1) the person from whom discovery is sought resides or is

found in the district; (2) the discovery is for use in a proceeding before a foreign tribunal; and (3)

the application is made by a foreign or international tribunal or any interested person."  *In re*

*Application of Microsoft Corp.*, 428 F. Supp. 2d 188, 192 (S.D.N.Y. 2006) (internal quotation

marks and citation omitted).

Once these statutory requirements are satisfied, district courts have "broad discretion over

the issuance of discovery orders pursuant to § 1782."  *In re Edelman*, 295 F.3d 171, 181 (2d Cir.

2002); *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004) (§ 1782

"authorizes, but does not require, a federal district court to provide judicial assistance to foreign

or international tribunals or to 'interested person[s]' in proceedings abroad"); *Marubeni Am.*

*Corp. v. LBA Y.K.*, 335 F. App'x 95, 96 (2d Cir. 2009) (summary order) ("Once the statutory

requirements are met, a district court is free to grant discovery in its discretion." (internal

quotation marks and citation omitted)).  In *Intel*, the Supreme Court identified four factors to

guide district courts in exercising this discretion:

> (1) Whether the documents or testimony sought are within the foreign tribunal's
> jurisdictional reach, and thus accessible absent § 1782 aid;
> (2) The nature of the foreign tribunal, the character of the proceedings underway
> abroad, and the receptivity of the foreign government or the court or agency
> abroad to U.S. federal-court judicial assistance;

(3) Whether the § 1782 request conceals a[n] attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and

(4) Whether the subpoena contains unduly intrusive or burdensome requests.

*In re Microsoft Corp.*, 428 F. Supp. 2d at 192–93 (citing *Intel*, 542 U.S. at 264–65).  The Second

Circuit has emphasized that this discretion must be exercised "in light of the twin aims of the

statute: providing efficient means of assistance to participants in international litigation in our

federal courts and encouraging foreign countries by example to provide similar means of

assistance to our courts."  *Id.* at 193 (internal quotation marks and citations omitted).

### B.    Federal Rule of Civil Procedure 45

Federal Rule of Civil Procedure 45 permits a party to command, via a subpoena, the

production of documents that are in the "possession, custody, or control" of a non-party.  Fed. R.

Civ. P. 45(a)(1)(A)(iii).  The documents, however, need not be in the physical possession of the

non-party from whom discovery is sought.  *S.E.C. v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471

(S.D.N.Y. 2000).  Instead, courts have construed "control" broadly so as to permit discovery

from a non-party with "the legal right, authority, or practical ability to obtain the materials

sought upon demand."  *Id.* (collecting cases); *see also Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,

490 F.3d 130, 138 (2d Cir. 2007) ("[A] party is not obliged to produce, at the risk of sanctions,

documents that it does not possess or cannot obtain. . . .  However, if a party has access and the

practical ability to possess documents not available to the party seeking them, production may be

required.").[3]  "This principle applies where discovery is sought from one corporation regarding

---

[3] Although *Shcherbakovskiy* involved a discovery request under Rule 34, which pertains to discovery from parties to a litigation, rather than Rule 45, "[t]he scope of discovery under the two rules is coextensive."  *Credit Bancorp*, 194 F.R.D. at 471 n.4; *accord Chevron Corp. v. Salazar*, 275 F.R.D. 437, 447 n.8 (S.D.N.Y. 2011) ("[T]he phrase 'possession custody or control' carries the same meaning under both Rules.").

materials which are in the physical possession of another, affiliated corporation." *Dietrich v. Bauer*, No. 95 Civ. 7051 (RWS), 2000 WL 1171132, at *3 (S.D.N.Y. Aug. 16, 2000).

"[T]he burden is on the party seeking discovery to make a showing that the other party has control over the materials sought." *Credit Bancorp*, 194 F.R.D. at 472 (collecting cases); *accord Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12 Civ. 6608 (PKC) (JCF), 2014 WL 61472, at *3 (S.D.N.Y. Jan. 6, 2014) ("Where control is contested, the party seeking production of documents bears the burden of establishing the opposing party's control over those documents.") (collecting cases); *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB) (MHD), 2004 WL 2149111, at *2 (S.D.N.Y. Sept. 23, 2004). Accordingly, where discovery is sought from an entity for documents in the physical possession of another, affiliated entity, "[i]t is the discovering party's burden to demonstrate that the requested entity has either the legal right or the practical ability to obtain the documents in question from their custodian." *In re Nortel*, 2004 WL 2149111, at *2.

## III.    Discussion

Because § 1782 provides that discovery for use in foreign proceedings shall be produced "in accordance with the Federal Rules of Civil Procedure," 28 U.S.C. § 1782(a), the Court first considers the threshold question of whether the subpoena satisfies the requirements of Rule 45.

As an initial matter, Passport argues that DTTL waived its objections to the subpoena. That argument lacks merit, as the record shows that DTTL served its objections within the 14-day period required by Rule 45. *See* Fed. R. Civ. P. 45(d)(2)(B) (objections "must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served"). Although Passport delivered a copy of the subpoena, addressed to DTTL, to Deloitte LLP on June 22, 2015, it did not properly serve the subpoena on DTTL until November 5, 2015. *See*

Pecoraro Decl. ¶¶ 2, 4–5.  DTTL's objections, served on November 18, 2015, *id.* ¶ 3; Blue Decl., Ex. L, were thus timely, and the Court may consider them on the merits.

DTTL's primary objection is that it cannot be required to produce the Letter sought by Passport because the Letter is not within DTTL's "possession, custody, or control."  DTTL Br. 7–9.  Passport has acknowledged that the Letter is in the physical custody of Deloitte Pakistan. *See* Pet. ¶ 7; Blue Decl., Ex. D, ¶ 6.  The Court, therefore, must determine whether Passport has shown that DTTL is nonetheless in "control" of the Letter, as that term has been defined for purposes of Rule 45.

DTTL argues that Passport has not done so, because it has not shown that DTTL has either the legal right or the practical ability to obtain the Letter from Deloitte Pakistan.  The Court agrees.

### A.     Passport Has Not Shown that DTTL Has the Legal Right to Obtain the Letter

As to the first type of "control," DTTL argues that it does not have the legal right to obtain the Letter because it is a "legally separate and independent entit[y]" from Deloitte Pakistan.  Pecoraro Decl. ¶ 13.  Accordingly, DTTL argues, it does not have the legal authority to obtain, much less compel, from Deloitte Pakistan documents which that firm cannot or will not voluntarily produce.  *Id.*

In support of this argument, DTTL cites a number of cases that have found that Deloitte firms do not have the legal right to obtain documents from one another, or to act on one another's behalf.  DTTL Br. 8 (citing *In re Nortel*, 2004 WL 2149111, at *1–4; *United States v. Deloitte & Touche USA LLP*, 623 F. Supp. 2d 39, 41–42 (D.D.C. 2009) (Deloitte USA did not possess control over "legally distinct entity" Deloitte Switzerland), *aff'd in part, vacated in part, remanded sub nom. United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010); *Motorola*

*Credit Corp. v. Kemal Uzan*, 02 Civ. 666 (JSR), Dkt. 373, at 4 (S.D.N.Y. Feb. 19, 2003) (record did not show that Deloitte Touche Tohmatsu and Deloitte USA had the legal right, authority, or practical ability to obtain materials from Deloitte Turkey)).

For example, in *In re Nortel*, the court rejected plaintiffs' efforts to obtain discovery from Deloitte Canada via a subpoena on Deloitte USA.  2004 WL 2149111, at *4.  Although Deloitte Canada had apparently shared some information with Deloitte USA in the past, the court found that plaintiffs had not demonstrated a legal right on the part of Deloitte USA to obtain the work papers at issue, because they "fail[ed] to identify any enforceable obligation on the part of the Canadian entity to provide such access."  *Id.* at *2.  To the contrary, the court noted, provisions of Deloitte Canada's manual and the Verein Agreement, which governed the relationship among member firms of Deloitte Touche Tohmatsu, "le[ft] to the Canadian firm the discretion whether to provide documents to another member firm of the *verein*."  *Id.*

Passport argues that *In re Nortel* and the other cases cited by DTTL are irrelevant because, since they were decided, "Deloitte has changed its global structure."  Passport Reply Br. 4.  Passport notes that, at the time of those decisions, Deloitte firms were members of Deloitte Touche Tohmatsu, a Swiss membership association or *verein*, and their relationship was thus governed by the terms of the Verein Agreement.  *Id.*  Today, however, Deloitte is no longer a Swiss *verein*; rather it is organized under DTTL, a United Kingdom private company limited by guarantee.  *Id.*  Passport argues that because the Verein Agreement does not presently govern the relationships among DTTL and its member organizations, the decisions on which DTTL relies are inapposite.  *Id.*

Crucially, however, it is not enough for Passport merely to point out that the cases cited by DTTL are not dispositive on the issue of whether DTTL, under Deloitte's current

organizational structure, has legal control over documents in the possession of Deloitte Pakistan. Rather, because Passport, as the party seeking discovery, bears the burden of demonstrating that DTTL has "possession, custody, or control" of the Letter, it must affirmatively show that DTTL enjoys such authority. *See Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 n.7 (S.D.N.Y. 1992) ("In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion."). Passport has not done so.

Most tellingly, Passport has not, in its briefing or at argument, identified a *single* way in which the current global structure of Deloitte materially differs from its prior organization as a Swiss *verein*. It has not, for instance, pointed to a governance document or contract that gives DTTL the "the right to insist on access to [Deloitte Pakistan's or] other members' documents." *In re Nortel*, 2004 WL 2149111, at *2. And the record suggests the contrary conclusion: that DTTL and its member firms enjoy no greater legal authority to access one another's documents than they did under Deloitte's prior organizational structure.

At argument, DTTL's outside counsel represented that the fact that Deloitte is now organized around a UK private limited company as opposed to a Swiss *verein* is irrelevant to the question of whether DTTL enjoys access to the internal documents of Deloitte's member firms. Tr. 36–37. Counsel explained that both organizational structures consist of a conglomeration of distinct member firms, which operate independently in their own countries and are subject to their own laws and professional practices. Tr. 29 ("DTTL is a complete distinct entity from all of the member firms, entirely distinct entity."); *see also* Pecoraro ¶¶ 10–11, 13. And under both configurations, member firms look to an international membership organization, DTTL, which serves as a "branding entity," akin to a franchisor, for assuring quality control and management

10

of the Deloitte name throughout the world.  Tr. 36–37; *see also* Tr. 29 ("DTTL is an entity

that . . . is branding.  We license our name to firms that can show that they meet certain quality

standards.  We provide them with policies [and] procedures.").  As such, DTTL's counsel

explained, while DTTL could conceivably revoke a member firm's license to use the Deloitte

trade name, it "absolutely cannot" compel member firms, such as Deloitte Pakistan, to turn over

documents from their client files for some purpose unrelated to quality control.  Tr. 30–33.

Consistent with this, the Deloitte Pakistan website confirms that, as under the Verein Agreement,

"DTTL and each DTTL member firm are legally separate and independent entities, which cannot

obligate each other."  Deloitte, About Us, http://www2.deloitte.com/pk/en/pages/about-

deloitte/articles/about-deloitte.html (last accessed Feb. 22, 2016).  Passport did not articulate any

concrete basis on which to refute that characterization.

       In the absence of evidence that DTTL has greater legal authority to access documents

from Deloitte Pakistan, or indeed any concrete basis to regard the change from the *verein* system

to Deloitte's current structure as giving DTTL greater access to the audit documents of an

affiliate like Deloitte Pakistan, the reasoning underlying the holdings in *In re Nortel* and the

other cases cited by DTTL retains force:  As in those cases, the decision whether to produce the

requested document appears to belong solely to a Deloitte firm that is entirely distinct from the

firm from which discovery is sought.  Passport has, therefore, not satisfied its burden of showing

that DTTL has the legal right or authority to obtain the Letter.

    **B.**    **Passport Has Not Shown that DTTL Has the Practical Ability to Obtain the Letter**

       Passport argues that even if DTTL does not have a legal right to obtain the Letter from

Deloitte Pakistan, the subpoena is proper because "it is apparent from the facts . . . that DTTL

has the *practical ability*" to do so.  Passport Reply Br. 1 (emphasis added).

In *In re Nortel*, the court provided an overview of the standards to be applied when assessing the "practical ability" of one entity to obtain documents from another.  2004 WL 2149111, at *3.  It explained that, "[i]n answering that question, [courts] naturally focus on the relationship between the targeted entity and the custodian of the documents, the manner in which the custodian has handled the documents at issue and similar categories of documents in the ordinary course of business, and any business or other interests that may impact on the willingness of the custodian to share the documents with the subpoenaed entity in the current circumstances."  *Id.*; *accord Credit Bancorp*, 194 F.R.D. at 472 ("One of the circumstances which warrants a finding of control is where a corporate entity has the ability in the ordinary course of business to obtain documents held by another corporate entity.").

Applying these standards here, the Court notes, Passport has made "no showing of any arrangement between [DTTL] and Deloitte [Pakistan] or any mechanism that gives [DTTL] the practical ability to access Deloitte[] [Pakistan's] work papers," such as the Letter.  *In re Vitamin C Antitrust Litig.*, No. 06 MD 1738 (BMC), 2012 WL 5879140, at *8 (E.D.N.Y. Nov. 21, 2012). It has not, for instance, shown that documents of the type sought "flow[ed] freely" between DTTL and Deloitte Pakistan, *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 8 Misc. 85 (WHP), 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999), or that DTTL had access to such documents "in the ordinary course of business," *Credit Bancorp*, 194 F.R.D. at 472.  To the contrary, Passport's counsel conceded at argument that Passport has no evidence that anyone at DTTL enjoys routine access, via a corporate database or otherwise, to the internal work papers of Deloitte Pakistan. Tr. 14.

DTTL, for its part, has squarely represented that it lacks the practical ability to obtain the Letter.  At argument, its outside counsel, James J. Farrell, represented that DTTL cannot

12

unilaterally access the Letter or any other internal documents submitted by Deloitte Pakistan's clients for auditing purposes.  Tr. 27–28 ("So we absolutely have no ability to get the document. . . .  [T]his is pretty standard in accounting firms, would be true in the U.S. [and] is true in Pakistan. . . .  [W]e can't surreptitiously take it from them . . . .  We don't have any access to do that."); Tr. 29 (noting that there are no records of Deloitte Pakistan's that DTTL is "able on its own authority to access").  Accordingly, he explained, any access to the Letter by DTTL would have to be facilitated by Deloitte Pakistan.  Passport has not come forward with any factual basis on which to doubt these representations of DTTL's representative.

And Deloitte Pakistan has explicitly stated that it will not provide the requested records to DTTL, because, it asserts, it is prohibited by Pakistani laws and regulations from giving DTTL, or any other outside person or entity, such access.  In a letter to Passport's counsel, Deloitte Pakistan's counsel explained that Pakistani laws and regulations "prevent [Deloitte Pakistan] from producing any document provided by the client for the purposes of the audit of their financial statements."  Blue Decl., Ex. M.  Deloitte Pakistan's letter further explained that "providing any documents to third parties without authorization would result in [Deloitte Pakistan] being found guilty of professional misconduct . . . as there is an express statutory bar that prevents [it] from disclosing '*any information acquired in the course of [its] professional engagement to any person other than [its] client, without the consent of [its] client or otherwise required by any law for the time being in force*.'"  *Id.* (emphasis in original).  It is undisputed that the Letter was submitted by ARY to Deloitte Pakistan for the purposes of an audit.  *See* Pet. ¶ 7. The Court has been given no reason to discredit Deloitte Pakistan's claim that, under Pakistani law, it is legally prohibited from sharing the Letter with *any* person or entity other than ARY,

including Deloitte's marketing arm DTTL or a Deloitte member firm, without ARY's consent, which ARY has refused to provide.

In light of the foregoing, there is no non-speculative basis on which to infer that Deloitte Pakistan would voluntarily cede the Letter to DTTL. Deloitte Pakistan has squarely refused to do so, and has explained its refusal. Deloitte Pakistan's spurning of Farrell's efforts, on behalf of DTTL, to obtain a copy of the Letter, reinforces this conclusion. *See* Tr. 25–28. According to Farrell, when he reached out to Deloitte Pakistan, Deloitte Pakistan was "adamant [that he] could not have [the Letter]," and insisted that it could not release the Letter—even to DTTL—without a court order directed at Deloitte Pakistan or ARY's consent. Tr. 28. Consistent with this, the record reflects, Deloitte Pakistan proved similarly unwilling to share the Letter with Deloitte LLP. *See* Blue Decl., Ex. B-2, Ex. 12, at 4.

Finally, DTTL represents, through in-house counsel, that it "has never received a copy of the Letter." Pecoraro Decl. ¶ 12. Passport concedes that it has no evidence to the contrary, or, indeed, any evidence that anyone at DTTL has ever seen the letter. Tr. 14; *see In re Nortel*, 2004 WL 2149111, at \*3 ("The absence of any evidence that the sought-after documents ever were shown to Deloitte USA . . . supports the American firm's contention that it does not have the practical ability to obtain the documents [from Deloitte Canada].").

In the face of this compelling bloc of evidence, Passport offers three arguments why DTTL, ostensibly, has the practical ability to obtain the Letter. None is persuasive.

First, Passport argues, DTTL has "a proven ability to obtain documents from Deloitte Pakistan," including "documents related to Passport and ARY that ARY insists should not be produced." Passport Reply Br. 1. In support of this argument, Passport relies exclusively on a single document—specifically, a letter sent from ARY's counsel to Deloitte Pakistan on

December 12, 2015.  The letter, a copy of which DTTL sent to Passport, states that Deloitte

Pakistan is "not authorized to release any document pertaining to [ARY] or submitted by [ARY]

to [Deloitte Pakistan] for the purposes of audit or otherwise."  Blue Decl., Ex. N.  Passport

argues that it follows from DTTL's ability to obtain *this* letter from Deloitte Pakistan that

"DTTL has the ability to obtain documents from Deloitte Pakistan when it chooses to do so."

Passport Reply Br. 1.

      This argument is quite unpersuasive.  To begin with, it is well established that "[t]he

exchange of . . . limited information . . . is not evidence of a free flow of documents between . . .

two entities," such that one entity can be deemed to have "control" over *all* documents in

possession of the other.  *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 142 (E.D.N.Y. 2009); *see*

*also Motorola Credit Corp.*, 02 Civ. 666, Dkt. 373, at 3 (fact that Deloitte Turkey previously

transferred some documents to Deloitte USA "does not necessarily imply that Deloitte USA has

the ability to obtain documents from Deloitte Turkey" under other circumstances).

      This is especially true where the documents sought are of a fundamentally different

character from those shared in the past.  Such is the case here.  The letter to which DTTL

obtained access is an artifact of this § 1782 litigation.  It was sent by ARY, to communicate its

refusal to consent to Deloitte Pakistan's request to release audit records relating to ARY, *after*

Deloitte Pakistan had resigned as ARY's auditor.  *See* Blue Decl., Ex. B-2, Ex. 12, at 1 (January

14, 2015 email noting Deloitte Pakistan's resignation).  Accordingly, unlike the Letter itself, the

December 12, 2015 letter is not a document acquired "in the course of [Deloitte Pakistan's]

professional engagement" for the purposes of an audit.  Blue Decl., Ex. M.  It makes complete

sense that Deloitte Pakistan would voluntarily share this non-confidential litigation document

with DTTL, as a means of *protecting* its former client's audit files against release, while

simultaneously refusing to produce those files themselves, the dissemination of which, it has asserted, could subject it to liability under Pakistani law.  DTTL's possession of the December 12, 2015 letter, therefore, does not, at all, impeach DTTL's claim that it lacks the practical ability to obtain the Letter.

This case is also easily distinguished from *M.L.C., Inc. v. N. Am. Philips Corp.*, 109 F.R.D. 134 (S.D.N.Y. 1986), and *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997), on which Passport relies for the proposition that "control" should be found where the recipient of a discovery request has demonstrated its "ability to easily obtain [documents] when it was in their interest to do so," 109 F.R.D. at 138.  In *M.L.C.*, the recipient had demonstrated its ability to obtain the *very documents* that were the subject of the discovery request.  *Id*.  And in *Bank of New York*, the company that had physical possession of the sought-after documents was "fully cooperating with [the recipient's] requests by searching for and turning over relevant documents from its files."  171 F.R.D. at 149.  Here, by contrast, DTTL has never had access to the Letter.  And Deloitte Pakistan has refused to make it available (and has explained that refusal).  Further, Passport has no evidence that DTTL has obtained access to a *single* internal document of Deloitte Pakistan's other than the December 12, 2015 litigation letter.  Tr. 18.  In this case, therefore, unlike in *M.L.C.* and *Bank of New York*, there is no factual basis for concluding that DTTL could obtain the Letter were it motivated to do so.

Passport next argues that the Court should infer that DTTL has the practical ability to seek documents from Deloitte Pakistan because statements made by a partner of Deloitte LLP reflect coordination among Deloitte firms across the globe.  Pl. Reply Br. 3.  Specifically, Passport notes that when it informally requested the Letter from Deloitte LLP, a Deloitte LLP partner responded that "our Pakistan firm" claimed that the Letter was confidential, and that the

matter "ha[d] been turned over to our U.S. and International legal departments to coordinate with

our firm in Pakistan." *Id.* (citing Blue Decl., Ex. B-2, Ex. 12, at 2, 4).  The partner later informed

Passport that "our Pakistan firm" had resigned and "we are unable to release" a copy of the

Letter due to Pakistani regulations.  *Id.* (citing Blue Decl., Ex. B-2, Ex. 12, at 1).  Passport argues

that these statements "indicate[] that Deloitte employees in the U.S. had the practical ability to

obtain the letter from Deloitte Pakistan simply by asking, but that the only impediment was

'Pakistani regulations.'"  *Id.* (emphasis omitted).

      This argument falls far short.  Communications and coordination among members of the

Deloitte empire in connection with subpoenas issued against several of them says nothing about

the availability of a member entity to gain documents of an audit client of another.  And the mere

existence of a "close working relationship" between two firms with respect to some matters does

not demonstrate the practical ability of one to obtain documents upon demand from the other.

*See Deloitte & Touche USA*, 623 F. Supp. 2d at 41 ("Close cooperation on a specific project does

not, per se, establish an ability, let alone a legal right or authority, on Deloitte USA's part to

acquire documents maintained solely by a legally distinct entity.").  Deloitte LLP's references to

Deloitte's "International legal department" and "Global GC," *see* Blue Decl., Ex. B-2, Ex. 12, at

1–2, reflect the reality that the Deloitte empire has global reach, but they do not imply an ability

on the part of its marketing arm DTTL to unilaterally access the internal documents of member

firms within the Deloitte umbrella.

      Tellingly, the very communications on which Passport relies actually belie its contention

that DTTL is capable of obtaining the Letter.  They bluntly state that Deloitte Pakistan refused to

release the Letter following its communications with both Deloitte LLP and DTTL.  *See* Blue

Decl., Ex. B-2, Ex. 12, at 4 (email from Deloitte LLP partner to Passport, dated December 23,

2013, indicating that "[t]he message [Deloitte Pakistan] sent suggest[s] that, due to local laws and regulation[s] for client confidentiality they are forbidden from sharing the work product contained within the file"); *see also In re Nortel*, 2004 WL 2149111, at *3 ("Further support for [Deloitte USA's] contention [that it lacked the practical ability to compel production of documents by Deloitte Canada] is found in the representation of Deloitte USA that, upon receipt of plaintiffs' subpoena, it advised its Canadian counterpart of the request, and that that firm affirmatively represented that it would not yield the documents."). This, too, undermines Passport's suggestion of DTTL's ready access to the Letter.

Finally, Passport argues that the fact that DTTL's inside and outside counsel, in rejecting Passport's bid for the letter, did not affirmatively attest that they requested, but were refused, access to the Letter by Deloitte Pakistan shows DTTL's practical ability to obtain the document. Tr. 19 ("I think Mr. Pecoraro's declaration is remarkable in that he never says, I asked for the document and was told, No, you can't have it."). DTTL's outside counsel, however, represented at argument that he, in fact, requested and was definitively denied such access. *See* Tr. 25–28. And even if DTTL had *not* done so, that omission, without more, would not discharge Passport's burden to "establish that [DTTL] has the 'practical ability' to obtain the document." *In re Vitamin C Antitrust Litig.*, 2012 WL 5879140, at *3. Simply put, Passport "ha[s] made no showing to support [the] conclusion [that Deloitte Pakistan would voluntarily turn over the Letter to DTTL] and, thus, ha[s] not met [its burden]" as the party seeking discovery. *Id.* (citing *Golden Trade*, 143 F.R.D. at 525 n.7 ("In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion.")).

Therefore, the Court holds that Passport has not satisfied its burden of establishing that DTTL has the legal right or practical ability to obtain the Letter, which is in the physical possession of Deloitte Pakistan.  In light of this holding, the Court has no occasion to consider whether, if it did, the statutory requirements under § 1782 discovery and the discretionary *Intel* factors would support enforcement of the subpoena here.

If Passport seeks to discover the Letter or other documents in the possession and control of Deloitte Pakistan, it must do so by other means, including pursuing appropriate legal channels in Pakistan.[4]

## CONCLUSION

For the foregoing reasons, Passport's motion to enforce the subpoena against DTTL is denied.  The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 1.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: March 1, 2016
       New York, New York

---

[4] At argument, Passport's counsel explained Passport's failure to date to pursue such channels on the ground that Passport is skeptical that legal action in Pakistan would be effective. *See* Tr. 11, 13.  Counsel, however, acknowledged that he is unaware of whether Passport has received any legal advice as to this point.  Tr. 12.